## *In re* BROWN'S ESTATE.

WILLS — MENTAL COMPETENCY—UNDUE INFLUENCE—DIRECTED VERDICT.

Where a will was contested on the grounds of mental incompetency and undue influence, but the evidence clearly established that testatrix was mentally competent, although she suffered temporarily from alcoholic psychosis, in the opinion of physicians, which accounted for her eccentric and peculiar actions, and there was no evidence of undue

Wills, 40 Cyc. pp. 1331, 1332, 1333; 27 L. R. A. (N. S.) 2; L. R. A. 1915A, 444; 28 R. C. L. 86 *et seq.;* 3 R. C. L. Supp. 1558; 4 R. C. L. Supp. 1799; 6 R. C. L. Supp. 1703.

influence, a verdict sustaining the will was properly directed.

Error to Wayne; Merriam (De Witt H.), J. Submitted June 8, 1927. (Docket No. 41.) Decided July 29, 1927.

Patrick J. Sheahan presented for probate the last will of Catherine Minnis Brown, deceased. On petition of Dennis J. Butler the will was certified to the circuit court. Judgment for proponent on a directed verdict. Contestant brings error. Affirmed.

*William Henry Gallagher, Edward J. Fallon,* and *William H. Fallon,* for appellant.

*Daniel M. Lynch, Frank W. Atkinson,* and *William F. Connolly,* for appellee.

WIEST, J. Catherine Minnis Brown, widow, without issue, aged about 67 years, died December 9, 1923, leaving a last will and testament executed March 15, 1921, and a codicil dated November 1, 1923. She left an estate of between $400,000 and $500,000. In the will she bequeathed to many relatives named the sum of $79,000. This includes a bequest of $7,000 to Dennis J. Butler, a nephew, contestant. To a brother of her deceased husband, Brown, she bequeathed the sum of $7,000; to friends and former help the sum of $14,500; to the Catholic Church Extension Society for masses for herself and others the sum of $13,000; to the Union Trust Company, in trust for named grand nephews and nieces, the sum of $15,000; to Patrick J. Sheahan, her attorney, "or his heirs him surviving," the sum of $5,000; to the Rev. Michael P. Bourke, Chaplain of the Chapel of St. Mary's of the Immaculate Conception of Ann Arbor, or his successor in charge of the chapel, for the use and benefit of the chapel erected for the Catholic students attending the Uni-

versity of Michigan, the sum of $3,000; the residue of the estate she bequeathed in equal shares to the Convent of Our Lady of Mercy, Tuam, Ireland; the Mission of the Immaculate Virgin of the city of New York, State of New York, and the Bishop of Detroit, in trust, for St. Joseph's Home for Boys. The codicil increased bequests to certain individuals; the bequest to Mr. Sheahan being increased to $6,000, made additional bequests of $9,800, and provided $2,000 for masses for the soul of her second husband. Robert Minnis, her first husband, died in April, 1918, and William G. Brown, her second husband, died August 25, 1923.

Upon filing the will for probate, Dennis J. Butler, nephew, gave notice of contest on several grounds, all of which simmered down to alleged mental incompetency of testatrix. The issue was certified to the circuit court for trial. In the circuit, at the close of contestant's proofs, the court was asked by proponents to direct a verdict sustaining the will. This was taken under advisement, proponents introduced their proofs, the issue was submitted to the jury, and during the deliberation of the jury the court heard counsel on the motion, called the jury into court and directed a verdict sustaining the will. Judgment was entered upon the verdict and the case brought to this court by writ of error. Assignments of error present objections to admissions of evidence, but decision turns upon whether the court was in error in directing the verdict.

Contestant claims the evidence presented an issue of fact for the jury to determine. Was there sufficient evidence of want of mental capacity on the part of testatrix to call for a verdict of the jury? The record has been carefully examined, fair import accorded the testimony of witnesses for contestant, and it is our conclusion that the verdict was properly directed.

The record is long and we cannot do more than make general review thereof.

When her second husband died testatrix sent a nephew to the cemetery to make sure a space would be left for her burial between the graves of her two deceased husbands. This struck the nephew as a crazy idea. We omit comment on such testimony. The body of her first husband was placed in the casket, clothed in a black and white check suit, celluloid collar, bright red necktie, with a diamond stickpin. The suit had been procured for a contemplated trip to Florida and never worn. We cannot say that clothing suitable for Florida is so inappropriate for last obsequies as to be an insane use thereof.

This woman, by exercise of business acumen, created her wealth and conserved it until her death. She had mental capacity to amass a fortune, but, contestant asserts, not intelligence enough to distribute it by will. She called to her aid an attorney and directed disposition of her estate in a will expressing 45 clear cut desires. It is claimed that she used whisky, morphine, veronal and atropin, was ruthless with tenants, suspicious, changeable in likes and dislikes, deceitful, opinionated, unfair with her help, accusative, selfish and imaginative, insane, and her health was poor. She seemed to have been a decided success in a business way. In the will and codicil she bequeathed $6,000 to her attorney. The attorney does not claim to have rendered services calling for any such award, and the bequest is much stressed by contestant. It is of passing interest, however, to note that, in an earlier will prepared, after many weeks' conference with contestant, Mrs. Brown therein made a bequest of $10,000 to one of the attorneys now representing contestant, but only fair to say this was to compensate him also as executor. If testatrix wanted to give her attorney $6,000, and was mentally com-

petent to make a will, and in so giving deprived no relative having rightful call upon her bounty, she was at liberty to do so. The most appealing indication of mental decrepitude on the part of testatrix appears in the bequest of $7,000 to contestant, made after testatrix was aware of his acts hereinafter mentioned. We speak of this because the record shows that a lay witness noted it, and the fact was given place in a hypothetical question propounded by the attorney for contestant. But even this urge does not bring us to the point of holding that it was any evidence of insanity.

The 23d day of September, 1918, Mrs. Brown executed a previous will, and also a deed conveying a very valuable piece of property to contestant. Contestant testified that he assisted Mrs. Brown for several weeks in preparing for such testamentary disposition, and that the deed was not to become effective until her death. The evidence is persuasive that Mrs. Brown was then suffering from alcoholic psychosis. On that day, and for some time previous thereto, contestant and his wife cared for Mrs. Brown at her home and gave her frequent drinks of whisky, and Mrs. Brown was then taking drugs. While under the influence of whisky or a drug she was, at times, irrational and somewhat violent. What she then said and did was brought into the case as evidence of insanity. The doctors who attended her, and were called as witnesses by contestant, completely disposed of such asserted evidence of insanity. This we will take up later.

October 3, 1918, or ten days after the execution of the will and the deed to contestant, testatrix was taken by the attorney who had prepared the instrument and Mr. Butler to St. Joseph's Retreat at Dearborn, and there confined, without her consent, in a ward for the insane. The next day contestant filed a petition in

the probate court asking for the appointment of a guardian for testatrix, alleging she was a person not mentally competent to manage her property. Three weeks later testatrix was released from the retreat and contestant discontinued his application for a guardian, stating it was a mistake. At the time testatrix was taken from her home to the retreat she had about $9,000 in money in her home, and contestant placed such money, together with the will and deed, in a safety deposit box and delivered the key thereof to Mr. Gallagher, one of his attorneys. Mr. Gallagher had acted as attorney for testatrix for some time, and was advised by a physician that it was necessary to remove testatrix to some hospital or place where she could be cared for or have constant attendance at her own home. This physician was connected, in a professional way, with St. Joseph's Retreat, and suggested taking testatrix there. When testatrix returned to her home from the retreat she demanded return of her money and papers and the return was made, together with the deed she had executed to contestant. Testatrix was much exercised over the treatment she had received and later brought suit against contestant to recover damages. We understand that suit was never tried. The will in suit revoked the will of September, 1918.

The medical witness who saw testatrix in September, 1918, and advised that she be taken to some hospital, and who treated her at St. Joseph's Retreat, testified that when he first saw her she was delirious, erratic, incoherent, turbulent, and aggressive, and that she was in a very serious condition as far as her health and mind were concerned and required skillful treatment and control, and, being asked what hospital he would recommend, naturally recommended the one under his own control; that she was in the retreat and under his observation and treatment for exactly three weeks; that in a general way her case resembled an attack of *delirium tremens,* and she was given the general

principles of the treatment for poisoning of that type; that, as a result of observation and a conference with other experts at the retreat, he concluded it was necessary to give up a suspicion he had entertained that syphilis existed as a possible cause; that he found a convincing certainty that alcohol and alcoholic drugs, like veronal, had produced the very serious condition in the patient; that after these three weeks' treatment in the retreat her hallucinosis was relieved, although he could hardly call her well. In a hypothetical question detailing alleged insane acts of testatrix, the expert was asked: "Whether or not at the time this will and codicil were made, the patient was suffering from the condition that you have described, and was fully competent to make a will?" The physician answered:

"Mr. Gallagher, I do not know how I could answer that question fairly; I know this lady had a mental disorder that was likely to continue. Everything that you have described there would tend to make me think, as a medical man, the mental disorder had continued, but when you are asking me to state what her condition was at any specified date, month, and years after I saw her, I can only answer it inferentially, I know she was a disordered woman mentally; I would feel in my heart that her judgments were impaired; how much, I don't know."

He also said she was probably permanently incapacitated mentally. But, on cross-examination, he stated that her disease was multiple neuritis, caused by alcohol and veronal, and stated:

"I do not pretend to claim to know whether or not on the 15th day of March, 1921, she was able to know the extent and nature of the property that she owned and the people to whom she might be under some obligation to remember. I am sure that immediately around the 3d of October she was not competent to do that, I am quite satisfied. * * * I do not know what her condition was on the first of November, 1923."

And he was unable to say she was mentally incompetent at the time of the execution of the will on March 15, 1921.   He also testified:

"As a general rule a person who gets this toxic poisoning get this toxic poisoning from some cause, such as lead, or alcohol, or ergot; and when the cause is removed, when the irritating and actuating cause is removed, the patient recovers.   That is the general history of multiple neuritis.  *  *  *  In a general way, after a mental storm like that, there is probably some mental weakness that continues.   But the degree of it, I don't know anything about, or whether or not it was to a degree which would incapacitate her from signing and executing a contract knowingly, and with the ability to comprehend as to the nature and purpose of the transaction, I do not know."

The other medical witness who saw the testatrix at her home on September 25th and October 3, 1918, advised that she have a special nurse day and night, or be committed to some institution, or rather be taken to some institution where she could be cared for and be deprived of alcohol.   He diagnosed her trouble as alcoholic psychosis, a temporary disease, brought about by the excessive use of liquors containing alcohol, and expressed the opinion that when the irritating cause, namely, alcohol, was removed the disease would disappear.   He also testified:

"I determined that she had what we call an alcoholic psychosis; and if she was placed where she could not get whisky, she would come out of it."

Asked:

"Come out of it, and as far as you could see, when you met her on the street two months later, she had come out of it?
"*A.* Yes, sir."

We have considered the testimony given by lay witnesses, and the eccentric and peculiar actions of testatrix testified to by them either fall within the cause

found by the physicians or were wholly insufficient to evidence mental incapacity to execute the will and codicil in suit.   The mental capacity of testatrix was clearly established at the trial, and there was no evidence of mental incapacity calling for submission of such issue to the jury.

In the brief for contestant undue influence is mentioned.   The proofs present no such issue and the bequest to the attorney supports no such inference.

The judgment is affirmed, with costs against contestant.

SHARPE, C. J., and BIRD, SNOW, STEERE, FELLOWS, CLARK, and MCDONALD, JJ., concurred.